Filed 5/15/23 (see concurring opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE PORTILLO et al.,<br><br>    Defendants and Appellants. | B315241<br><br>(Los Angeles County Super. Ct. No. KA127308) |

APPEAL from judgments of the Superior Court of Los Angeles County, Victor D. Martinez, Judge.  Affirmed with directions.

Jeffrey Manning-Cartwright, under appointment by the Court of Appeal, for Defendant and Appellant Jose Portillo.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant Orlando Portillo.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose Portillo and Orlando Portillo[1] appeal from judgments of conviction entered after a jury found them each guilty of one count of grand theft (Pen. Code, § 487, subd. (a)).[2] Jose and Orlando contend there was insufficient evidence to support their convictions because the evidence failed to establish the value of the stolen items—15 boxes of adjustable dumbbells—exceeded $950. The only evidence of the dumbbells' value was the testimony of the manager of the warehouse facility where the theft occurred, who testified to the prices listed on three retailers' websites for the same product. Jose and Orlando contend this testimony was inadmissible hearsay because it was offered for the truth of the dumbbells' value.

We conclude evidence of a retail price for a stolen item, whether based on an online listing or a brick-and-mortar store price tag, is admissible for the nonhearsay purpose of showing that a retailer is advertising the item for a specified price in the marketplace. This price, in turn, is circumstantial evidence of the fair market value of the item, defined under California law as the highest price obtainable in the marketplace between a willing buyer and a willing seller. The jury need not decide the truth of whether a specific retailer would sell the item for the advertised price or the value the retailer places on the item, nor should the jury consider the evidence for these hearsay purposes. A defendant is always free to introduce evidence that the retailer is

_____

[1]     We refer to Jose Portillo and Orlando Portillo by their first names to avoid confusion.

[2]     Further undesignated statutory references are to the Penal Code.

2

not willing to sell the item for the listed price (i.e., it is mismarked or unavailable), or evidence of lower prices from other retailers. But this goes to weight, not admissibility. Therefore, the three online prices were admissible as circumstantial evidence of the fair market value of the dumbbells.

Orlando also contends there was insufficient evidence he committed theft because only Jose was caught removing the dumbbells from the warehouse loading dock. However, there was substantial circumstantial evidence Orlando aided and abetted the theft. Finally, Jose and Orlando contend the trial court erred in ordering them to pay the cost of probation services because the statutory authorization for charging defendants probation services fees was repealed by Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 92, § 47) (Assembly Bill 1869), effective July 1, 2021. Although the court's minute order does not provide that Jose and Orlando must pay the cost of probation services, we direct the court to correct the oral pronouncement of judgment to reflect that Jose and Orlando are not responsible for paying the costs of probation services. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*
    1. *The events of January 23, 2021*

At approximately 1:39 a.m. on Saturday, January 23, 2021, Los Angeles County Sheriff's Deputy Virginia Bynum was on routine patrol in the City of Industry when she noticed a gate was open at the Comptree warehouse facility on Brea Canyon Road. Deputy Bynum drove into the facility to investigate, where

3

she noticed a vehicle with an interior light on backed up to a loading dock next to a freight trailer.

Deputy Bynum approached the vehicle, a silver sports utility vehicle (SUV), and found Jose loading cardboard boxes into the back.[3] The boxes were labeled "'Dialtech Selective Dumbbell.'" When Deputy Bynum approached Jose, he was extremely nervous and was looking around. The SUV was parked next to a 45-foot freight trailer, which had its cargo doors open and was backed up to the loading dock. The loading dock area was completely dark, with the only illumination coming from inside the SUV. Deputy Bynum determined the boxes in the SUV were similar to those inside the trailer.

Detective Bynum estimated the loading dock platform was approximately four to four-and-a-half feet above the ground.[4] Because of the height of the platform, Deputy Bynum had to assist her partner in climbing up onto the loading dock. After placing Jose under arrest, Deputy Bynum helped her partner unload the dumbbells from the SUV and found them to be "very heavy."[5] A total of 15 boxes of dumbbells were unloaded from the SUV.

Los Angeles County Sheriff's Deputy Richard Muehlich responded to Deputy Bynum's call for backup. Upon arrival, he

---

[3]    Deputy Bynum identified Jose in court.

[4]    Comptree manager Johnny Lee estimated the loading dock platform was three feet high. Photographs of the loading dock taken during the daytime were admitted at trial. It appears from the photographs that the platform was at least four feet high.

[5]    Photographs of the cardboard boxes stacked in the rear of the SUV were admitted at trial. The box label stated the dumbbells weighed 25 kilograms (about 55 pounds).

conducted a search of the Comptree facility for additional suspects. After about 35 minutes searching the property, Deputy Muehlich found Jose's brother Orlando[6] underneath a semi-trailer truck parked at the other end of the loading dock. Orlando was balanced on top of the six-inch axle of the truck. Deputy Muehlich was wearing a body camera, and an audio-video recording of their encounter was played for the jury.[7] Asked why he was there, Orlando told Deputy Muehlich he met a friend named Rick and borrowed Rick's black Nissan Versa. Orlando explained he was hiding under the truck because "it was raining a long time ago" and "[his] brother was gonna come pick [him] up or something," but Orlando "fell asleep." Orlando did not know Rick's last name or have any information about Rick other than that he lived in Pomona. Orlando was also unable to provide the address of the Comptree facility or name any of the surrounding streets. Deputy Muehlich searched but could not find a Nissan Versa or similar car parked in the area.

Deputy Muehlich's body camera video showed Orlando was wearing a hooded jacket. Deputy Muehlich searched Orlando and found a functioning headlamp in his pocket, but Orlando did not have a crowbar or other tools that might be used to pry open

---

[6]     The parties stipulated that Jose and Orlando are brothers.

[7]     The jury was provided a transcript of Deputy Muehlich's encounter with Orlando. Deputy Muehlich read Orlando his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Portions of the body camera recording and transcript were redacted based on Jose's objection the interview implicated Jose and, if admitted, would violate his right to cross-examine Orlando under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.

a door. Deputy Muehlich also recovered a wallet containing a California identification card bearing Orlando's name from the SUV, between the passenger seat and center console.

At around 8:30 a.m. on the day of the theft, Johnny Lee, Comptree's warehouse manager, learned of the incident after seeing he had many unanswered calls from the alarm company. In preparation for a meeting with Los Angeles County Sheriff's Detective Rudy Zamora two days later, Lee reviewed the surveillance footage of the loading dock from the morning of the incident. Lee observed two individuals coming out of the SUV whom he did not recognize. Lee determined from the video and from his subsequent inspection of the premises that the items being removed from the freight trailer were boxes of dumbbells. Lee had not given permission to anyone to take boxes from the trailer on January 23, 2021.[8] Lee provided the surveillance video to Detective Zamora.

Detective Zamora reviewed the surveillance video and testified about its contents. An excerpt of the video was played for the jury, including the seven minutes leading up to Deputy Bynum's arrival. The field of vision covered by the surveillance camera included the parking lot where the SUV and freight trailer were parked, but it did not include the loading dock. At the beginning of the video excerpt, an SUV pulls into the facility and backs up toward the loading dock. A man in a hooded jacket emerges from the passenger's side of the SUV, followed by a man

---

[8] Lee testified that at about 1:39 in the morning, only a delivery company driver would typically be at the Comptree facility. He had a relationship with the drivers and did not recognize either of the two men as one of the drivers with whom he worked.

(Jose) in a long-sleeve shirt coming from the driver's side. Jose opens the liftgate on the back of the SUV while the man in the jacket places a headlamp on his head and turns it on. The man in the jacket then disappears from the frame in the direction of the loading dock and is not seen on the videotape again. About 40 seconds later, however, a beam of light flashes toward Jose from the direction of the loading dock. Jose then approaches the light and disappears from the frame. Five seconds later Jose reenters the frame carrying a box from the loading dock to the SUV, which he places in the back of the SUV. Jose returns to the loading dock, and after about six seconds he reappears carrying another box to the SUV. On his third trip, a beam of light emanating from the loading dock illuminates Jose from behind.

After six trips within the next two minutes between the loading dock and the SUV, Jose enters the driver's side of the SUV and backs it closer to the loading dock. In the next three minutes, Jose makes nine more trips between the loading dock and the SUV, each time carrying one box. At that point, Deputy Bynum's patrol car pulls into the parking lot and turns the car's spotlight on, and Jose freezes while crouched in the back of the SUV after positioning the 15th box.

2. *Evidence of the value of the dumbbells*

Lee was the only witness to testify about the value of the dumbbells. Based on his review of the surveillance video and his inspection of the freight trailer, Lee determined the boxes removed from the trailer contained dumbbells with manufacturing number W38416389. On January 25 Lee entered the manufacturing number on Amazon.com. Asked by the prosecutor, "What value did you determine?" Lee responded,

"$500," or $7,500 for 15 boxes. Lee had also looked up the same manufacturing number on the Walmart website. Asked at trial, "Do you recall the value amount that Walmart gave?," Lee responded, "Not exactly. Over $300."[9] With his recollection refreshed by a document from the Walmart website, Lee testified the Walmart price was $357 per box, for a total of $5,355 for 15 boxes. Lee also had input the manufacturing number on a website called "Gym and Fitness." After he refreshed his recollection with a document from that website, he testified the price asked by Gym and Fitness was $498 a box, or $7,470 for 15 boxes. The prosecutor did not offer the website printouts into evidence.

During cross-examination, Lee testified Comptree did not sell the dumbbells, but rather, it ships products for other companies. Lee did not have any bills of sale or invoices relating to the dumbbells.

---

[9] The defense attorneys objected on hearsay grounds to the prosecutor's questions about the retailers' website prices. At a sidebar, the defense attorneys argued the website prices were hearsay because they were offered for the truth of the value of the items. The prosecutor asserted the prices were not hearsay because they were offered to show the value assigned by the retailers, and even if they were hearsay, the testimony about the prices was admissible as testimony about a "computer-generated document" similar to the Kelley Blue Book. The trial court overruled the objections on the ground "fair market value in the marketplace is certainly relevant based upon what other retailers are selling the same item for."

B.    *The Verdicts and Sentencing*

On August 23, 2021 the jury found Jose and Orlando guilty of grand theft (§ 487, subd. (a)).

At the sentencing hearing the same day, the trial court suspended imposition of sentence and placed Jose and Orlando on two years of formal probation on the condition they serve 180 days in county jail.  The court found Jose and Orlando had no ability to pay court fees or a crime prevention fine (§ 1202.5).  The court imposed and stayed a $300 restitution fine (§ 1202.4, subd. (b)) pending proof of an ability to pay, and imposed and stayed a probation revocation fine in the same amount (§ 1202.45).  The court orally ordered Jose and Orlando to "obey all rules and regulations of the probation department including paying the cost of the probation services based on your ability to pay."  However, the minute order for the hearing did not refer to payment for probation services, stating only that each defendant "obey all rules and regulations of the probation department." (Capitalization omitted.)  The minute order also stated:  "All other mandatory fees are waived based on an inability to pay in accordance with the case of [*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168]."[10]

Jose and Orlando timely appealed.

---

[10]    In *People v. Dueñas, supra*, 30 Cal.App.5th at page 1168, this court concluded that imposing court assessments and fees ""upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (Accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655, review granted Mar. 11, 2020, S259755.)

9

## DISCUSSION

A.     *Grand Theft and Standard of Review*

"Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft." (§ 484, subd. (a).)  "Theft is divided into two degrees, the first of which is termed grand theft; the second, petty theft." (§ 486.)  "Grand theft is theft committed . . . [¶] . . . [w]hen the money, labor, real or personal property taken is of a value exceeding nine hundred fifty dollars ($950) . . . ."  (§ 487, subd. (a).)  The elements to prove grand theft are "'the taking of personal property [valued at more than $950] from the owner . . . into the possession of the criminal without the consent of the owner or under a claim of right, [and] the asportation of the subject matter [with] the specific intent to deprive the owner of his property wholly and permanently.'"  (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 922; accord, *People v. Walther* (1968) 263 Cal.App.2d 310, 316; see *People v. Davis* (1998) 19 Cal.4th 301, 305 ["The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away."].)

"In determining the value of the property obtained, for the purposes of [theft offenses], the reasonable and fair market value shall be the test."  (§ 484, subd. (a); see *People v. Romanowski* (2017) 2 Cal.5th 903, 914 (*Romanowski*) ["courts have long required section 484's 'reasonable and fair market value' test to be used for theft crimes that contained a value threshold"].)  "The fair market value of an item is 'the highest price obtainable in the

market place' as between 'a willing buyer and a willing seller, neither of whom is forced to act.'" (*People v. Grant* (2020) 57 Cal.App.5th 323, 329 (*Grant*); accord, *Romanowski*, at p. 915; *People v. Pena* (1977) 68 Cal.App.3d 100, 104.)[11] "Fair market value is 'not the value of the property to any particular individual.'" (*Grant*, at p. 329; accord, *People v. Lizarraga* (1954) 122 Cal.App.2d 436, 438.)

"Fair market value may be established by opinion or circumstantial evidence." (*Grant, supra*, 57 Cal.App.5th at p. 329.) "The price charged by a retail store from which merchandise is stolen" is "sufficient to establish the value of the merchandise," absent proof to the contrary. (*People v. Tijerina* (1969) 1 Cal.3d 41, 45 (*Tijerina*); accord, *Grant*, at p. 329.) "Jurors may also 'rely on their common knowledge' in determining the value of an item." (*Grant*, at p. 329; accord, *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1366.)

We review a trial court's ruling on a hearsay objection for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of

---

[11] The jury was instructed with a version of CALCRIM No. 1801, with the following definition of fair market value: "Fair market value is the price a reasonable buyer and seller would agree on if the buyer wanted to buy the property and the seller wanted to sell it, but neither was under an urgent need to buy or sell." (See *Romanowski, supra*, 2 Cal.5th at p. 915 [citing CALCRIM No. 1801 definition of fair market value given here]. CALCRIM No. 1801 provides as an alternative definition, "Fair market value is the highest price the property would reasonably have been sold for in the open market at the time of, and in the general location of, the theft." (Italics omitted.)

evidence, including one that turns on the hearsay nature of the evidence in question"]; *People v. Yates* (2018) 25 Cal.App.5th 474, 484-485 [same]; see *People v. Grimes* (2016) 1 Cal.5th 698, 711 [trial court's decision on admissibility under Evidence Code section 1230 reviewed for abuse of discretion].)  However, to the extent a hearsay ruling turns on a question of law, as it does here, we review the question de novo.  (*Grimes*, at p. 712 ["Whether a trial court has correctly construed Evidence Code section 1230 is, however, a question of law that we review de novo."]; see *People v. Louis* (1986) 42 Cal.3d 969, 986 [conclusions of law are subject to de novo review].)

With respect to Orlando's challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt."  (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].)  "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'"'"  (*Penunuri*, at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.)

"'"'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.'"'" (*People v. Vargas, supra*, 9 Cal.5th at p. 820; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 324.) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Penunuri, supra*, 5 Cal.5th at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

B.      *Substantial Evidence Supports a Finding the Value of the Dumbbells Exceeded $950*

1.      *Hearsay and nonhearsay evidence*

Hearsay is an out-of-court statement offered for the truth of its content. (*Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447 (*Hart*); *People v. Sanchez* (2016) 63 Cal.4th 665, 674; Evid. Code, § 1200, subd. (a).) Conversely, "[w]hen an out-of-court statement is offered for any relevant purpose other than to prove the truth of the matter stated, the statement is not hearsay." (*People v. Wilson* (2021) 11 Cal.5th 259, 305; accord, *People v. Armstrong* (2019) 6 Cal.5th 735, 786.)

When considering whether an out-of-court assertion is nonhearsay, "[t]he first and most basic requirement for applying the not-for-the-truth limitation . . . is that the out-of-court statement must be offered for some purpose independent of the

13

truth of the matters it asserts.  That means that the statement must be capable of serving its nonhearsay purpose regardless of whether the jury believes the matters asserted to be true." (*People v. Hopson* (2017) 3 Cal.5th 424, 432, citing 2 McCormick on Evidence (7th ed. 2013) The Hearsay Rule, § 249, p. 189, fn. 2 ["if in fact the statement must be true for the inference desired, then the ostensible nonhearsay use is invalid"]; accord, *Hart, supra*, 9 Cal.5th at p. 447; *People v. Armstrong, supra*, 6 Cal.5th at p. 786.)  As the Supreme Court explained in *Hart*, "For example, suppose A hit B after B said, 'You're stupid.'  B's out-of-court statement asserts that A is stupid.  If those words are offered to prove that A is, indeed, stupid, they constitute hearsay and would be inadmissible unless they fell under a hearsay exception.  However, those same words might be admissible for a nonhearsay purpose: to prove that A had a motive to assault B.  The distinction turns not on the words themselves, but what they are offered to prove."  (*Hart*, at pp. 447-448; see *Armstrong*, at p. 786 [assault victim's use of racial slur was relevant to show defendant's motive].)  Because "[o]therwise competent evidence must also be relevant, . . . the nontruth offered must be relevant." (*Hart*, at p. 448.)

The Supreme Court in *Hart* acknowledged with respect to the hearsay analysis, "The concept can prove analytically elusive when the words themselves also make an assertion."  (9 Cal.5th at p. 448, citing 1 Witkin, Cal. Evidence (5th ed. 2018) Hearsay, § 37, p. 832 ["The distinction between these two uses of the evidence is not always readily apparent."].)  In *Hart*, for example, the court considered whether a construction foreman's testimony that an invoice for pipes bearing the name "Keenan Supply" and a stylized "K" logo was hearsay in a case where the ultimate

disputed fact was whether Keenan supplied pipes for the project. (*Id.* at p. 449.) The court held the name and logo on the invoice were nonhearsay because "the link between Keenan and the pipes does not depend on the word 'Keenan' being a true statement that Keenan supplied the pipes. Instead, the link relies on several circumstances demonstrated by the evidence," including the foreman's testimony that when the pipes were delivered, he "was given an invoice bearing Keenan's name and logo," which matched the load delivered, in addition to evidence the company's practice was to provide invoices bearing its name and logo with its pipes. (*Id.* at pp. 449-450.) The connection between the pipes and the supplier would have been evident "even if the company name and logo were not expressive of [the company's] identity as the source."[12] (*Id.* at p. 449.)

---

[12] The Supreme Court in *Hart, supra*, 9 Cal.5th at page 449 analogized the Keenan invoices to the documents at issue in *People v. Goodall* (1982) 131 Cal.App.3d 129, 143 and *People v. Williams* (1992) 3 Cal.App.4th 1545, 1542, in which the Courts of Appeal held that documents identifying the defendant (including correspondence, receipts, and licenses) recovered from dwellings were nonhearsay evidence that the defendants resided at the dwellings. The *Hart* court observed, "In *Goodall* and *Williams* the documents were relevant regardless of their truth. It was the presence of the documents, not the truth of their content, that linked those defendants to the residences. Even if the documents bore false aliases, they could still be evidence of the disputed link, if it could be established that [the defendants] used those false names." (*Hart*, at p. 449.)

15

2. *The retailers' price listings were admissible circumstantial evidence of the stolen dumbbells' value*

This case presents, as *Hart* describes it, an "analytically elusive" hearsay case. (*Hart, supra*, 9 Cal.5th at p. 448.) The challenge stems from the fact price listings on a retailer's website and price tags in a brick-and-mortar store[13] can serve multiple evidentiary purposes to prove the ultimate fact: the value of stolen items. Some of these purposes clearly implicate hearsay. For example, an out-of-court statement by a Walmart employee that Walmart was offering to sell adjustable dumbbells for $357 (or a price listing or price tag to that effect) is hearsay if it is offered for the truth that Walmart was willing to sell the dumbbells for $357 or that Walmart believed the value of the dumbbells was $357.[14]

---

[13] For simplicity we refer to prices posted on a retailer's website as price listings, and brick-and-mortar store price tags as price tags. We treat price listings and price tags the same in our hearsay analysis.

[14] We recognize, as the concurrence highlights, that Lee in his testimony referred to the website price listings interchangeably as "values" and "prices." For example, when asked whether he had determined the "value" of the dumbbells from the Amazon website, Lee testified (after a hearsay objection was sustained) that the "value" was $500. However, as to the Walmart website, the prosecutor inquired as to the "price that [Lee] learned" from the website. Following a sidebar discussion, Lee testified, after being shown the Walmart website printout to refresh his memory, that the "amount" on the Walmart price listing was $357. And with respect to the Gym and Fitness website, Lee was asked for the "price or value . . . from that website," and he responded (again after having his memory refreshed with a

16

However, a price listing or price tag is also evidence of a retailer's offer to sell the item for a specified price, for the purpose of inviting a marketplace transaction. If evidence of the Walmart price tag in the store or price listing for $357 is presented to show Walmart was advertising the dumbbells for sale at $357, but not for the truth of whether Walmart would consummate a transaction at the advertised price (i.e., whether a customer could actually purchase the dumbbells from the retailer at this price), this would be a nonhearsay purpose because it is "relevant regardless of [its] truth." (*Hart, supra*, 9 Cal.5th at p. 449; accord, *People v. Hopson, supra*, 3 Cal.5th at p. 432.) Thus, if admitted for this nonhearsay purpose, it could well be that a customer could not buy the dumbbells at the advertised price if, for example, the customer clicked the "buy now" icon on the retailer website and learned there were no dumbbells available or was told at the cash register that the salesperson was unable to ring up the item at the price on the price tag. The question, then, is whether evidence of the existence of a retailer's advertised price (the nonhearsay purpose) is relevant to show the fair market value, regardless of whether the individual retailer is willing to sell at that price or believes its price reflects the value

---

printout from the website) that the "value amount" was $498. Although the use of the word "value" instead of "price" was imprecise, it is clear from the testimony that Lee was providing the prices listed on the retailers' websites. Moreover, the defense attorneys did not object to the wording of the questions, nor do they argue on appeal that use of the word "value" in describing the price listings rendered the responses hearsay.

17

of the item (the hearsay purposes). (*Hart*, at pp. 447-448; *Hopson*, at p. 432.) We conclude that it is.[15]

As discussed, the value of stolen property under section 487, subdivision (a), means "fair market value," which measures "'the highest price obtainable in the market place' as between 'a willing buyer and a willing seller, neither of whom is forced to act.'" (*Grant, supra*, 57 Cal.App.5th at p. 329.) The existence of an advertisement by a retailer to sell an item at a stated price supports a reasonable inference a willing seller would sell the item and a willing buyer would purchase the item

---

[15] Because we hold the price listings were not offered for a hearsay purpose, we do not reach the People's contention the listings fell within the hearsay exception for published compilations under Evidence Code section 1340. (See Evid. Code, § 1340 ["Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in Section 1270."].)

We also do not address whether Lee's testimony was inadmissible under Evidence Code section 1523, subdivision (a), as oral testimony offered to prove the contents of writings (the price listings) that were available. (See Evid. Code, § 1523, subd. (a) ["Except as otherwise provided by statute, oral testimony is not admissible to prove the content of a writing."].) Jose and Orlando forfeited this objection by failing to assert it either in the trial court or on appeal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 721 ["'"'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable"'"]; *People v. Jennings* (2010) 50 Cal.4th 616, 654 [failure to make hearsay objection at trial forfeited claim on appeal].)

18

for the stated price. The question is not whether a specific seller (here, Walmart, Amazon, or Gym and Fitness) was actually willing to sell the item for the stated price or whether it valued the item at that price because, as discussed, the fair market value is "'not the value of the property to any particular individual.'" (*Ibid*.)

Rather, the advertised prices may be considered by the jury as circumstantial evidence of the price at which willing sellers and willing buyers would consummate a transaction in the marketplace. The jury may believe, for example, that willing sellers and buyers would agree on a $500 price for the dumbbells by comparing that price to the prices advertised by multiple retailers, without knowing whether those retailers would sell the dumbbells at the advertised prices. By analogy, a car buyer looking to buy car X may be willing to pay $35,000 for the car after reviewing advertised prices by multiple car dealers ranging from $30,000 to $40,000, even if the buyer intended to spend less on a new car. And a car dealer might be willing to sell car X for $35,000 in light of the other dealers' advertised prices even if it believed the car was worth $40,000.

Likewise, the fact Amazon advertised the dumbbells for $500 is circumstantial evidence that $500 is a price obtainable in the marketplace between a willing seller and willing buyer—a reasonable juror could infer that if customers were not willing to pay this price, Amazon would have offered a lower price (or not listed the dumbbells at all). The advertised prices for the dumbbells in the marketplace are therefore relevant to a determination of fair market value under *Grant, supra,* 57 Cal.App.5th at page 320 and *People v. Pena, supra,* 68 Cal.App.3d at page 103. This result obtains even if the jury

19

does not believe the retailers would complete a sale if a customer clicked "buy now" or carried a box bearing a price tag to the cash register. Moreover, although the retailers could have provided admissible testimony as to their valuations of the dumbbells, their opinions were not necessary to a determination of fair market value in the marketplace.[16]

In his well-reasoned concurrence, Justice Segal argues evidence of a price listing, if not admitted for the truth that the seller is willing to sell the item at the listed price, cannot be used to prove fair market value because a price listing is not relevant to a determination of value if the retailer is not willing to sell the item at that price. (Conc. opn. *post*, at p. 1.) And, if the evidence is offered to show the retailer was willing to sell at the advertised price, under *Hart, supra*, 9 Cal.5th at page 447, the price listing or price tag is being offered for a purpose that is not "*independent* of the truth of the matter it asserts" (that the retailer was a willing seller), and thus it is inadmissible hearsay. At first glance, the reasoning in the concurrence appears to reveal a flaw in our hearsay analysis: How can a retailer's advertised price be relevant if the retailer is not willing to sell at the listed price? The answer lies in the role of the jury, which is not to determine what Amazon or Walmart thinks the dumbbells are worth, but

---

[16] It is undisputed that an owner's testimony is admissible as evidence of the value of an item. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 ["The opinion of an owner of personal property is in itself competent evidence of the value of that property. . . ."]; *People v. Coleman* (1963) 222 Cal.App.2d 358, 361 [owner of stolen tools was qualified to testify to value of property for purposes of proving grand theft].) There was no evidence here showing who owned the stolen dumbbells.

rather, to determine what value the marketplace places on the dumbbells.  As discussed, evidence of the advertised prices is relevant to a determination of the price in the marketplace regardless of whether each retailer—or in our earlier analogy, each car dealer advertising car X at a price between $30,000 and $40,000—was willing to sell the item or car at the advertised price.

The Supreme Court recognized the relevance of price tag evidence to determine the value of stolen items in *Tijerina, supra*, 1 Cal.3d 41.  In that case, the defendant was convicted of grand theft for stealing a box of clothes from a department store.  The box contained "46 packages of men's undershorts priced at $5 a package, 2 sweaters priced at $20 each, and one sweater priced at $16.99.  The box also contained 13 men's sport shirts and 17 packages of undershorts, the price of which does not appear." (*Id.* at pp. 44-45.)  The defendant argued "the retail price of the property does not establish its 'reasonable and fair market value'" and was insufficient to surmount the grand theft threshold (then $200).  (*Id.* at p. 45.)  The Supreme Court disagreed, holding, "In the absence of proof . . . that the price charged by a retail store from which merchandise is stolen does not accurately reflect the value of the merchandise in the retail market, that price is sufficient to establish the value of the merchandise."  (*Ibid.*)

More than 50 years later, the Supreme Court continues to cite *Tijerina* for the proposition that a retail price is sufficient evidence of fair market value in cases involving retail theft. (See *Romanowski, supra*, 2 Cal.5th at p. 915 [citing *Tijerina* for the definition of fair market value in the retail store context but clarifying as to stolen credit cards that absent a legal retail price, evidence of the price on the black market could be considered to

21

establish fair market value].) Although *Tijerina* did not involve a hearsay question, the *Tijerina* court's reliance on the prices on the price tags attached to the stolen merchandise (for which no transaction was ever consummated) to establish the value of the merchandise in the retail market is consistent with our conclusion that price listings and price tags are relevant evidence to prove value without regard to whether the store would have consummated the transaction at that price. (Cf. *Grant, supra,* 57 Cal.App.5th at p. 329 [where store employee's testimony showed an outlet store's pricing policy was to offer a significant discount from a "'comparable at'" price printed on clothing tags and nothing was sold at "'full price,'" substantial evidence did not support a grand theft conviction where the People introduced the "'comparable at'" price tags into evidence but did not establish that the tag value reflected fair market value].)[17]

---

[17] The cases cited by Jose to support his argument the three retail price listings are hearsay evidence are distinguishable. In *Kitchel v. Acree* (1962) 216 Cal.App.2d 119, the Court of Appeal held in the context of a contract dispute between homeowners and building contractors that the testimony of one of the homeowners as to a repair estimate he received from a third-party plastering contractor to repair the substandard installation of a cornice was inadmissible hearsay. (*Id*. at pp. 123-125.) Unlike the price advertised in the retail marketplace at issue here, the third-party contractor's estimate for the cost to repair the homeowners' property was offered for the truth of the price the contractor would charge to repair the homeowners' cornice; indeed, it could serve no nonhearsay purpose because the estimate was by its nature unique to the repair and could not support an inference about the price at which any other homeowners and contractors would come to agreement on any

The Court of Appeal in *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331 utilized a similar hearsay framework in analyzing offers in the marketplace for the purpose of calculating a spouse's ability to find employment. There, the court considered whether "help wanted" advertisements in a newspaper were hearsay when offered to show the availability of jobs for purposes of imputing a full-time teacher's salary to the wife in a dissolution action in determining whether the husband's child support obligation should be reduced. (*Id.* at pp. 1335-1336.) The family court had admitted newspaper advertisements soliciting applications for teaching positions from candidates with the same qualifications possessed by the wife. (*Id.* at pp. 1335, 1338.) The Court of Appeal concluded in affirming the reduction in child support that the family court "properly ruled the ads were admissible for the nonhearsay purpose of showing that offers to bargain existed," not for the hearsay purpose of showing whether the wife could secure a teaching position on the advertised terms. (*Id.* at p. 1338.) Similarly, here, we consider the advertised prices for dumbbells in the retail market for the nonhearsay purpose of showing there were offers to sell the dumbbells in a specified price range.

We recognize that price listing and price tag evidence, offered as circumstantial evidence of an item's value in the marketplace, is less reliable than a retailer's for-the-truth testimony as to the price at which the retailer has sold or would sell an item (or its own valuation of the item). But the question

___

other plastering project. *Garfinkle v. Montgomery* (1952) 113 Cal.App.2d 149 is inapposite for the same reason. (See *id.* at pp. 158-159 [lessor's cost-of-repair testimony based on third-party contractor's estimate to repair property was hearsay].)

before us is a threshold question of admissibility, not the evidence's weight or reliability. (See *People v. Dalton* (2019) 7 Cal.5th 166, 232 [where statement was admitted for a nonhearsay purpose, it need not have met the reliability requirements of a hearsay exception because a challenge to the statement's reliability "'at most, goes to the weight of the evidence, and not its admissibility'"]; *People v. Merriman* (2014) 60 Cal.4th 1, 72 [same].) Moreover, the People bolstered the reliability of the evidence by introducing three retail price listings: Walmart ($357), Amazon.com ($500), and Gym and Fitness ($498), all of which supported the jury's implied finding the fair market value of the stolen dumbbells exceeded the threshold for grand theft.[18] The defense could have introduced evidence of lower price listings or that the subject listings were unreliable because, for example, the retailers regularly discounted the advertised prices. (See *Grant, supra*, 57 Cal.App.5th at p. 329.)

We also acknowledge that admission of price listings or price tags for a nonhearsay purpose could result in jurors considering the evidence for an impermissible purpose, for example, that individual retailers are willing to sell the items for the listed price, thereby ascribing undue weight to the evidence. However, where evidence has a hearsay and nonhearsay purpose, the trial court may give a limiting instruction to ensure the jury considers the evidence for a proper purpose. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1080, fn. 9 ["When a statement is

---

[18] We note that because 15 boxes of dumbbells were recovered from the SUV, the People needed to prove each box of dumbbells had a fair market value of more than $63.33 to exceed the $950 threshold.

24

admitted as nonhearsay circumstantial evidence of the declarant's state of mind or effect on the listener, a limiting instruction is required informing the jury that 'the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered."]; Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"]; see also *Hart, supra*, 9 Cal.5th at p. 448 ["If the words are admitted for a nonhearsay purpose the jury is not allowed to consider the truth of any substantive assertion, and is often instructed to that effect."].) Absent a request, however, the trial court generally is not required to give a limiting instruction. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1229 [absent a request, "the trial court was under no obligation to give such limiting instructions"], disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Cowan* (2010) 50 Cal.4th 401, 479.) Jose and Orlando did not request a limiting instruction at trial, nor do they argue on appeal that one should have been given.[19]

---

[19] Had counsel for Jose or Orlando requested a limiting instruction, the trial court could have provided an instruction that read something to the effect of the following: "You have heard testimony concerning the advertised price of dumbbells from three retailers. You may consider those advertised prices in deciding what price a willing seller and a willing buyer would agree upon for the dumbbells in an open market, but not as evidence of the value the retailers placed on the dumbbells or that the retailer would sell the dumbbells at that price."

The People argue price tag evidence is admissible nonhearsay because "the price is a binding offer, a verbal act." The "verbal act" (or "operative fact") hearsay rule recognizes that statements that comprise direct evidence of the element of an offense or cause of action are not hearsay. (See *J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 19 [lease extension and sales agreements were not hearsay because "'documents containing operative facts, such as the words forming an agreement, are not hearsay'"]; *People v. Dell* (1991) 232 Cal.App.3d 248, 259 ["statements of solicitation by a prostitute, testified to by others, are not obnoxious to the hearsay rule and are admissible as 'verbal acts', i.e., as direct evidence of the substantive offense"].)

The concurrence finds this argument persuasive, concluding offers to sell the dumbbells at specified prices were not hearsay because they were verbal acts "elemental to the formation of such an agreement" for a sale by a willing seller to a willing buyer. (Conc. opn. *post*, at pp. 7-8.) However, whether an enforceable agreement to sell resulted from the advertised prices is not relevant to determination of the fair market value of the dumbbells stored at Comptree. And the cases that have applied the verbal act doctrine have done so to support a conclusion the words uttered were not offered to prove the truth of the matter asserted—the conclusion we reach without applying the doctrine. As this court explained in *People v. Dell, supra*, 232 Cal.App.3d at page 262, where the defendant was charged with pimping and pandering based on the solicitation by escorts who worked for the defendant's company, "the statements of the escorts, testified to by the officers, also were not offered for the truth of the matter asserted. The statements were not offered to prove the escorts

26

would actually perform these specific sex acts and at the quoted price . . . . These statements could be admitted as 'operative facts' or 'verbal acts' because they demonstrated an issue in the case: that the escorts were making verbal offers to enter into contracts of prostitution, that is, to engage in sexual intercourse or other lewd acts for money." We do not see a reason to extend the verbal act doctrine, which applies to direct evidence of an element of an offense or cause of action (such as contract formation), to a case where the evidence is introduced as circumstantial evidence of an element of an offense. Either way, the evidence was not introduced for the truth of the matter asserted.[20]

Numerous appellate courts outside of California have held that price tag evidence is not hearsay when used to establish the value of stolen retail items. For example, in *People v. Giordano* (N.Y.App.Div. 2008) 50 A.D.3d 467, 468 (*Giordano*) the Appellate Division of the New York Supreme Court held testimony about the price tag amounts on stolen jackets was admissible as nonhearsay circumstantial evidence to establish the jackets' fair market value. The court explained, "The tags were not offered as an assertion of value as distinct from selling price; as defendant concedes, only selling price itself is at issue here. Instead, the tags constituted circumstantial evidence of the price a shopper

---

[20] The concurrence suggests our opinion assumes the retail advertised prices do not constitute offers to sell. (Conc. opn. *post*, at pp. 4-5, fn. 2.) The retailer's advertised price may well be an enforceable offer to sell, but as discussed, the issue here is not whether Walmart or Amazon is bound to its advertised price—for purposes of our hearsay analysis, it does not matter whether the retailer is actually willing to sell the item.

27

would have been expected to pay for the jackets.  Thus, the tags were essentially verbal acts by the store, stating an offer to sell at a particular price."  (*Ibid*.)[21]

The Tennessee Court of Criminal Appeals reached a similar conclusion in *Norris v. State* (Tenn.Crim.App. 1971) 475 S.W.2d 553 (*Norris*), in which the defendant appealed his conviction for shoplifting a television with a value exceeding $100, arguing the only evidence of the value of the television was the hearsay testimony of two store security officers who stated the television had a price tag for $109.95, and it was not on a special sale.  The court affirmed the conviction, holding that "evidence that merchandise was displayed for regular sale at a marked price representing its retail price is sufficient circumstantial evidence of value, where totally uncontradicted, to support a conviction grounded upon the marked price as its value.  That the television set was displayed for sale over a period of time with a certain price tag upon it is not hearsay, but fact; and is evidence that the tag reflected its retail value."  (*Id.* at pp. 555-556.)

The New Mexico Court of Appeals in *City of Albuquerque v. Martinez* (N.M.Ct.App. 1979) 604 P.2d 842, 842 adopted the holding in *Norris* in affirming a shoplifting conviction based on the testimony of a discount chain security manager that a stolen jacket was valued at $47.97 based on the price tag that the defendant had removed.  The Court of Criminal Appeals of Alabama in *DeBruce v. State* (Ala.Crim.App. 1984) 461 So.2d 889, 891-892 (*DeBruce*) likewise followed the reasoning of *Norris*,

---

[21]    Although the *Giordano* court referred to the price tags as "verbal acts," the court principally relied on the fact the price tags were evidence of the selling price.  (*Giordano, supra*, 50 A.D.3d at p. 468.)

28

holding, consistent with the "weight of authority," that "a price tag attached to the stolen property at the time of the theft is sufficient circumstantial evidence of value, where totally uncontradicted, to support a conviction grounded upon the marked price of its value."[22] The court observed its finding "that

[22] The *DeBruce* court also cited *State v. White* (Conn. Super. Ct. 1981) 437 A.2d 145 and *Lacy v. State* (Miss. 1983) 432 So.2d 1205 in reaching its conclusion. (*DeBruce v. State, supra*, 461 So.2d at p. 891.) In *State v. White*, a Connecticut appellate court held that price tag evidence was not hearsay because of its inherent reliability. (*State v. White,* at p. 148 ["We are unpersuaded by the argument that such tags are technically excludable as hearsay unless qualified under the business records exception [citations]; since the inherent unreliability of hearsay is not present in this type of evidence. Rather, the fact that price tags generally reflect market value may be judicially noted, since this fact is both commonly known and capable of ready demonstration."].) The Mississippi Supreme Court endorsed this reasoning in *Lacy v. State*, at page 1206. Likewise, the Supreme Court of Virginia in *Robinson v. Commonwealth* (Va. 1999) 516 S.E.2d 475, 479 relied on *State v. White* in holding "the common-sense approach to the problem is to recognize an exception to the hearsay rule in shoplifting cases permitting the admission into evidence of price tags regularly affixed to items of personalty offered for sale or, in substitution, testimony concerning the amounts shown on such tags when, as in this case, there is no objection to such testimony on best evidence grounds." The court reasoned, "It is common knowledge that department and other stores regularly affix price tags to items of merchandise and that the tagged price is what a purchaser must pay to acquire an item, without the opportunity to negotiate a reduced price or to question how the tagged price was reached. [¶] Under these circumstances, 'the inherent unreliability of

the price tags are not inadmissible hearsay squares with the general rule that inscriptions or labels placed on packages for the purpose of indicating their contents are competent evidence, strong or weak according to the attendant circumstances, of their actual contents." (*Id.* at p. 892 [price sticker on stolen cup was admissible to show value of the stolen property, although store detective's opinion based on observation of the price sticker was not competent evidence].)

And in *State v. Pulver* (Or.Ct.App. 2004) 95 P.3d 250, 250, the Oregon Court of Appeals held that evidence of the price of stolen shoes, in the form of the store security guard's testimony as to their price tags and electronic scans of the product bar codes, was not hearsay. The court held that under Oregon law, "to prove the market value of stolen wholesale or retail property in a theft prosecution, the state must establish the value of the property in trade, not the value placed on property by its owner." (*Id.* at p. 251.) Therefore, "the state [had] to produce evidence of the price at which the shoes likely would have sold in the

_____

hearsay is not present.' [Citation.] Therefore, it would be unreasonable and unnecessary to require that in each case a merchant must send to court not only a security person but also other personnel to establish the reliability of the information shown on a price tag affixed to an item that has been stolen." (*Id.* at pp. 478-479.) Although the California Supreme Court has recognized that a Court of Appeal has the power to develop new hearsay exceptions where evidence "possesses an intrinsic reliability" and for which there is a "substantial need" (*In re Cindy L.* (1997) 17 Cal.4th 15, 28), we need not create a hearsay exception for price tag evidence because we conclude the evidence is admissible for a nonhearsay purpose when offered as circumstantial evidence of the fair market value of a stolen item.

ordinary course of business at the time and place of the theft. Admitted for that purpose, the shoes' prices, as revealed by the price tags and the scans of the [bar codes], were not out-of-court assertions of the fact to be proved, but were themselves direct evidence of the relevant fact." (*Id.* at p. 252.)

We have found few states (and Jose and Orlando do not identify any) in which price tag evidence has been found to be inadmissible hearsay. In *People v. Codding* (Colo. 1976) 551 P.2d 192, 193, the Colorado Supreme Court concluded that price tags for stolen power tools, about which a department store detective testified, "should have been excluded as hearsay in this case because they constituted a written record prepared by someone other than the detective and were offered for the truth of the matter asserted on the tags, namely, the retail cost of the merchandise." However, the holding in *Codding* was superseded by statute, which now provides, consistent with California law under the Supreme Court's holding in *Tijerina, supra*, 1 Cal.3d at page 45, that the price charged by a retail store is sufficient to establish the stolen item's value. (See Colo. Rev. Stat. Ann. § 18-4-414 ["[I]n all cases where theft occurs, evidence of the value of the thing involved may be established through the sale price of other similar property and may include, but shall not be limited to, testimony regarding affixed labels and tags, signs, shelf tags, and notices tending *to indicate the price of the thing involved.*"], italics added.) The Colorado statute goes even further and clarifies in section 18-4-414, subdivision (2), that "[h]earsay evidence shall not be excluded in determining the value of the thing involved."

In *Stephans v. State* (Nev. 2011) 262 P.3d 727, 731-732, the Nevada Supreme Court surveyed many of the foregoing cases and

31

others and concluded that courts have either held price tag evidence is nonhearsay circumstantial evidence, as in *Giordano* and *Norris*, or they have held such evidence is hearsay but "do[es] not require much to overcome the hearsay bar," for example through the business records exception (e.g., *State v. McPhie* (Idaho 1983) 662 P.2d 233, 236), or on the ground they are "self-authenticating" (e.g., *People v. Mikolajewski* (Ill.App.Ct. 1995) 649 N.E.2d 499, 504).  The court concluded the testimony of a security officer as to his memory of what the price tags on stolen bottles of cologne stated did not fall within any recognized hearsay exception for price tag evidence because the price tags were not admitted into evidence, and thus, there was no foundation for the security officer's stated memory of the numbers on the price tags.  (*Stephans*, at pp. 732-733 [security officer's testimony presented a "textbook case" of hearsay because security officer wanted "to testify to the value of goods in reliance on the price tags affixed by a merchant.  For this purpose the price tags are hearsay and a lay witness could not testify to such an opinion"].)  However, as discussed, we conclude the price tag evidence here was admissible not as the foundation for a lay opinion, but as evidence of the retailers' advertised prices for the dumbbells.  *Stephans* is of limited utility because of the court's focus on the foundation for the security officer's testimony, an issue we do not reach because of the lack of an objection on this basis.

In sum, the weight of out-of-state authority is consistent with the nonhearsay use of price tag evidence.  Although appellate courts have articulated varying rationales for admissibility, for over half a century courts throughout the country have concluded the price at which an item is advertised

for sale in the retail marketplace, whether on a price tag or otherwise, provides admissible evidence of the fair market value of the item for the purpose of determining whether a theft offense is a felony or misdemeanor.[23]

C.     *Substantial Evidence Supports Orlando's Conviction*

Orlando contends the evidence showed only that he was present at the scene on the morning of the theft, not that he participated in the theft perpetrated by Jose.  Substantial evidence supports Orlando's conviction.

First, there was substantial evidence Jose and a second man perpetrated the theft.  The surveillance video showed Jose and a second man entering the Comptree facility in the SUV around 1:30 on Saturday morning.  Lee testified the two men were not delivery drivers and were not authorized to move cargo. The second man got out of the SUV first, put on a headlamp, and exited the frame of the video next to the trailer from which the dumbbells were taken.  Although the second man is not seen

---

[23]     Orlando contends, for the first time on appeal, that admission of the price listings violated his rights under the confrontation clause.  But under *Crawford v. Washington* (2004) 541 U.S. 36, the confrontation clause bars admission only of testimonial hearsay.  (*Id.* at pp. 68-69; see *id.* at p. 59, fn. 9 [confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"].)  The price listings are neither hearsay nor testimonial.  (See *People v. Cage* (2007) 40 Cal.4th 965, 984 [a statement is testimonial if it was "given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial"].)

again in the video, the jury could reasonably infer he was still present and aiding Jose because the beam of a headlamp can be seen illuminating Jose's path during at least two of his trips between the loading dock and the SUV. Moreover, there is strong circumstantial evidence the second man was engaged in moving the dumbbell boxes out of the trailer and placing them either on the loading dock or handing them directly to Jose. Deputy Bynum testified each of the boxes was "very heavy," and the loading dock platform was about four feet above the ground level where Jose was walking back and forth to the SUV. Based on the short interval—mere seconds—during which Jose was out of the frame between each of his 15 trips to the SUV, it would have been impossible for Jose to climb up onto the loading dock, remove a large, heavy box from the trailer, set the box down on the loading dock, and climb back down to the ground level to complete the trip to the SUV. The only reasonable inference is that the second man perpetrated the theft by bringing the boxes to Jose. (See *People v. Davis*, *supra*, 19 Cal.4th at p. 305 [for the purpose of proving theft by larceny, "the slightest movement of the property constitutes a carrying away or asportation."].)

Second, there was substantial evidence the second man was Orlando. Deputy Muehlich conducted a search of the Comptree facility after Jose was apprehended, and 35 minutes later he found Orlando hiding with his body balanced on the axle of a truck parked at the other end of the same loading dock. Orlando had a headlamp in his pocket, and his clothing, including a hooded jacket, was consistent with clothing worn by the passenger of the SUV in the surveillance video. Orlando's wallet was found between the passenger seat and center console of the SUV.

34

On appeal, Orlando argues there was an innocent explanation for his presence at the scene, which he explained to Deputy Muehlich—that he had borrowed his friend Rick's car (a Nissan Versa) to get to the area, but he was sheltering from the rain waiting for Jose to pick him up, and he fell asleep. But Orlando was unable to provide any information about Rick to Deputy Muehlich except that Rick was from Pomona, and Deputy Muehlich did not find a Nissan Versa in the vicinity. Orlando also did not know his present location, and his explanation that he climbed on the axle of the truck to get out of the rain and then fell asleep was implausible and inconsistent with the evidence linking him to the SUV. In any event, we view the evidence in the light most favorable to the judgment, and, as discussed, there was substantial evidence of Orlando's involvement, regardless of whether the jury could have drawn a contrary inference he was simply waiting under the truck for Jose to pick him up. (*People v. Westerfield, supra*, 6 Cal.5th at p. 713; *People v. Penunuri, supra*, 5 Cal.5th at p. 142.)

D.     *The Trial Court Erred in Ordering Jose and Orlando To Pay the Cost of Probation Services*

Jose and Orlando contend the trial court erred when it ordered them to "[o]bey all rules and regulations of the Probation Department including paying the cost of probation services based on your ability to pay" because probation services fees are not authorized following the enactment of Assembly Bill 1869.[24] The

---

[24]     "Assembly Bill 1869 abrogated the authority to impose and collect 23 different administrative fees, including . . . the probation supervision fee . . . . It did so by adding section 1465.9

People concede Jose and Orlando were sentenced after the effective date of Assembly Bill 1869, and therefore, probation fees were not authorized. However, the People contend the minute order of the sentencing hearing did not include an order to pay probation fees, and "the now-repealed probation services fee was not imposed as a term or condition of probation as it was waived based on the appellants' inability to pay."

Contrary to the People's contention, the trial court orally imposed as a condition of probation that Jose and Orlando pay the costs of probation services, subject to their ability to pay. Therefore, the court must correct the oral pronouncement of judgment to reflect that Jose and Orlando are not responsible for paying the costs of probation. The People are correct that the minute order omits imposition of the unauthorized probation services fee, but correction is warranted because "the oral pronouncement of sentence controls over a subsequently entered minute order." (*People v. Sanchez* (2019) 38 Cal.App.5th 907, 919; accord, *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) Moreover, although the court found Jose and Orlando had a present inability to pay court fees and a crime prevention fine, stayed the restitution fine pending proof of ability to pay, and in

---

to the Penal Code . . . . [Citation.] Section 1465.9, subdivision (a) provides, 'On and after July 1, 2021, the balance of any court-imposed costs pursuant to [s]ection 987.4, subdivision (a) of [s]ection 987.5, [s]ections 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 3010.8, 4024.2, and 6266, as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.'" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625.) Section 1203.1b formerly authorized imposition of the probation supervision fee. (*Greeley*, at p. 625, fn. 3.)

its minute order stated that "all other mandatory fees are waived based on an inability to pay," none of these orders superseded the court's controlling oral order that Jose and Orlando "pay[] the cost of probation services based on [their] ability to pay . . . ." In addition, the ability of Jose and Orlando to pay the fees could change during their terms of probation.

Although we recognize the probation department is no longer authorized to recover its costs following the enactment of Assembly Bill 1869, Jose and Orlando will have no efficient redress if they are improperly charged for probation services in light of the defective order. (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 626 ["although the unpaid balance of the identified fees is no longer enforceable and collectible, [Assembly Bill 1869] *also* mandates that any portion of a judgment imposing those fees be vacated"].)

## DISPOSITION

The judgment is affirmed. We direct the trial court to correct its August 23, 2021 oral pronouncement of judgment to reflect that Jose and Orlando are not responsible for paying the costs of probation services.

FEUER, J.

We concur:

PERLUSS, P. J.

37

SEGAL, J., Concurring.

The majority opinion's treatment of the hearsay issue here is thorough, scholarly, and well-written.  And I agree with its conclusion the warehouse manager's testimony concerning online retail prices for the dumbbells was not hearsay.  But I do not agree with the way the majority reaches that conclusion.

According to the majority, the manager's testimony about the prices of the dumbbells he saw on Amazon.com, Walmart.com, and Gymandfitness.com was not hearsay because the People did not offer it to prove "the truth of whether [those retailers] would consummate a transaction at the advertised price" or believed the advertised price reflected the dumbbells' value, but to prove the retailers advertised the dumbbells at those prices.  (Maj. opn. *ante*, at p. 17.)  The majority states that "the existence of a retail advertised price (the nonhearsay purpose) is relevant to show the fair market value" of the dumbbells, "regardless of whether the individual retailer is willing to sell at that price or believes its price reflects the value of the item (the hearsay purposes)."  (*Id*. at pp. 17-18.)  That last statement doesn't sound right to me.  If an online retailer is not willing to sell the item at the advertised price or does not believe the advertised price reflects the item's value, then the advertised price does not tend to prove or disprove anything about the fair market value of the item.  (See *People v. Wright* (2021) 12 Cal.5th 419, 448 ["Evidence is relevant if it has a 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'"].)

The majority concludes otherwise, suggesting the "answer lies in the role of the jury."[1]  (Maj. opn. *ante*, at p. 20.)  The majority reasons a "jury may believe, for example, that a willing seller and willing buyer would agree on a $500 price for the dumbbells by comparing that price to the prices advertised by multiple retailers, without knowing whether the specific retailers would sell the dumbbells at the advertised prices."  (*Id*. at p. 19.)  In other words, as I understand it, the majority supposes a jury may reasonably infer merely from the fact that retailers have listed prices on the internet that a willing buyer and a willing seller—having seen the prices, but having no knowledge (and thus, presumably, no belief) about whether the retailers would actually sell at those prices—would agree on a price comparable to the ones listed.  I don't think that's a reasonable inference.  Suppose, for example, the advertised prices are substantially lower than what the advertisers are in fact willing to sell for.  If we assume, as we must, our hypothetical willing seller knows this (see *Cheng v. Coastal L.B. Associates, LLC* (2021) 69 Cal.App.5th 112, 123 ["'fair market value' under California law is the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties have reasonable knowledge of the relevant facts"]; *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274 ["fair market value, is the price that "'a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and

---

[1]     An odd place to look for answers to questions about hearsay.

2

both having full knowledge of all pertinent facts"""]), there is no reason the hypothetical seller would agree to a comparable price.

To clarify:  I think the majority may have succeeded (barely) in identifying a potential nonhearsay purpose for introducing evidence of the online retailers' price listings, namely, to prove those listings' mere "existence."  I just don't believe that purpose—as the majority has so narrowly limited it—is relevant to determining the dumbbells' fair market value.  In my view, to be relevant, the evidence of the price listings must tend to prove what the majority understands to be the "truth" they assert: the retailers' willingness to sell the dumbbells at the stated prices and, ultimately, the dumbbells' value.  That is, the price listing evidence is only relevant if it serves what the majority has identified as its hearsay purpose.  Under California law, even when there is a nonhearsay purpose for admitting an out-of-court statement, the statement is hearsay if the proponent offers it to prove the truth it asserts.  (See *Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447 [""" The first and most basic requirement for applying the not-for-the-truth limitation . . . is that the out-of-court statement must be offered for some purpose *independent* of the truth of the matters it asserts."""]; *People v. Hopson* (2017) 3 Cal.5th 424, 432 [same].)

Why, then, do I agree the evidence of the online retailers' prices was not hearsay?  To review:  In looking to the "reasonable and fair market value" to determine the value of property taken in a theft offense (Pen. Code, § 484, subd. (a)), courts consider that the "fair market value of an item is 'the highest price obtainable in the market place' as between 'a willing buyer and a willing seller, neither of whom is forced to act.'"  (*People v. Grant* (2020) 57 Cal.App.5th 323, 329; see *People v. Romanowski* (2017)

2 Cal.5th 903, 915 [determining the reasonable and fair market value of stolen access card information "requires courts to identify how much [the information] would sell for"].)  "When you have a willing buyer and a willing seller, neither of whom is forced to act, the price they agree upon is the highest price obtainable for the article in the open market." (*People v. Pena* (1977) 68 Cal.App.3d 100, 104; accord, *People v. Seals* (2017) 14 Cal.App.5th 1210, 1216.)

Like the majority, I consider the price listings introduced here to be "evidence of a retailer's offer to sell the [dumbbells] for a specified price, for the purpose of inviting a marketplace transaction."  (Maj. opn. *ante*, at p. 17.)  But I would go further: By all appearances, those price listings *were* offers to sell the dumbbells at the stated prices.  (See *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 271 (*Donovan*) ["The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances."]; *id.* at p. 272 [advertisements may constitute offers "where they invite the performance of a specific act without further communication and leave nothing for negotiation"]; *Nguyen v. Barnes & Noble, Inc.* (C.D.Cal., June 16, 2015) 2015 WL 12766130, at p. 4 [online retailer's display of "'HP TouchPad Tablet with 16GB Memory' for '$101.95 Online Price'" was an offer to sell because, being "'clear, definite, and explicit' as to all essential terms—namely, the item to be sold, the price, and

the manner of acceptance—it 'left nothing open for negotiation'"].)[2]

These offers by actual retailers to sell the dumbbells at stated prices were circumstantial evidence of a hypothetical agreement—between a willing buyer and a willing seller—that would establish the highest price obtainable in the marketplace for the dumbbells. (See *Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 328 [fair market value is "that amount that 'hypothetical buyers and sellers' would pay in a 'hypothetical transaction'"]; *People v. Seals, supra*, 14 Cal.App.5th at p. 1220 [in calculating the value of property stolen from a commercial establishment, "[d]etermining the fair market value of an item involves a hypothetical transaction between an informed buyer and seller"]; see also *People v. Grant, supra*, 57 Cal.App.5th at p. 329 [fair market value may be established by circumstantial evidence].) And that's where my hearsay analysis would end. For purposes

---

[2] The majority appears to view the price listings as advertisements, which "are not typically treated as offers, but merely as invitations to bargain." (*Harris v. Time, Inc.* (1987) 191 Cal.App.3d 449, 455; see *Donovan, supra*, 26 Cal.4th at p. 271 ["Some courts have stated that an advertisement . . . generally does not constitute an offer, but rather is presumed to be an invitation to consider, examine, and negotiate."].) "There is, however, a fundamental exception to this rule: an advertisement can constitute an offer, and form the basis of a unilateral contract, if it calls for performance of a specific act without further communication and leaves nothing for further negotiation." (*Harris*, at p. 455; see *Donovan*, at p. 272.) The testimony regarding the prices displayed by Amazon.com and the other retailers here does not suggest they were invitations to bargain or left anything to negotiate.

of proving the existence of an agreement, an offer is not a statement whose evidentiary value depends on its "truth," but a nonhearsay "verbal act" or "operative fact" whose evidentiary value derives from whether it occurred. (*People v. Dell* (1991) 232 Cal.App.3d 248, 258-262; see *People v. Fields* (1998) 61 Cal.App.4th 1063, 1069 [""There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not as to whether these things were true or false, and in these cases the words or acts are admissible not as hearsay, but as original evidence.""].)

As we explained in *People v. Dell*, *supra*, 232 Cal.App.3d 248, where we held testimony of "escorts' statements concerning the sex acts they would perform for [a] fee" was not inadmissible hearsay because the escorts' statements were "admissible as 'verbal acts' or 'operative facts'" (*id.* at p. 258): "Words of solicitation for prostitution are essentially words of offer and acceptance in the formation of a contract for sex in exchange for money. When trying to prove the existence of an oral contract the words the offeror uttered in making the offer clearly are admissible as nonhearsay to prove an essential element of the contract." (*Id.* at p. 261.) Other cases are in accord. (See, e.g., *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 793 ["exchange of words and telegrams by parties negotiating a contract ' . . . were verbal acts establishing a legal relationship,'" and "'evidence of this type ". . . is circumstantial, not testimonial; and it is therefore not obnoxious to the Hearsay Rule, nor needs for its admission any Exception to that rule""]; *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316 ["documents containing operative facts, such as the words forming an agreement, are not

hearsay"]; *People v. Jimenez* (1995) 38 Cal.App.4th 795, 802 ["[a]n operative fact, such as words forming an agreement, is not hearsay"]; *Skelly v. Richman* (1970) 10 Cal.App.3d 844, 858 ["oral and written statements of the negotiating parties were verbal acts establishing a legal relationship" and therefore not hearsay]; see also *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 749 [employer's oral assurances of job security were not hearsay because they were, "in and of themselves, evidence of the existence of . . . an implied promise" to terminate only for good cause]; *People v. Nelson* (1985) 166 Cal.App.3d 1209, 1215 [statement of consent to search a vehicle was not hearsay because "[i]t is the saying of the words of consent that is the issue involved, just as the saying of the words of a contract is nonhearsay and becomes the relevant issue involved to determine whether there is a contract"].)

I see—and the majority offers—no reason these principles should not apply equally to evidence introduced to establish the hypothetical agreement that serves as the basis for determining an item's fair market value. As offers to sell the dumbbells at stated prices, the online retailers' price listings were verbal acts (or operative facts) elemental to the formation of such an

7

agreement.[3]  Therefore, the testimony concerning those offers was not hearsay, and the trial court did not err in admitting it.[4]

SEGAL, J.

---

[3]     Evidently responding to this sentence, the majority asserts: "However, whether an enforceable agreement to sell resulted from the listed offers is not relevant to determination of the fair market value of the dumbbells . . . ." (Maj. opn. *ante*, at p. 26.) But my sentence does not refer to an "enforceable agreement";[*] it refers to "such an agreement," i.e., a hypothetical agreement between a willing buyer and a willing seller.  Which the majority and I agree is relevant to determining fair market value.

> [*] An enforceable agreement would require acceptance of the offer to sell, and there is no evidence here of acceptance.

[4]     I agree with the majority that substantial evidence supported Orlando's conviction for theft and that the trial court erred in ordering Jose and Orlando to pay the cost of probation services.